Filed 6/24/16  P. v. Estrada CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>JESUS VEGA ESTRADA,<br><br>     Defendant and Appellant. | B262224<br><br>(Los Angeles County<br>Super. Ct. No. KA103873) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Robert M. Martinez, Judge.  Reversed with directions.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and Ana R. Duarte, Deputy Attorney General, for Plaintiff and Respondent.

_____

Jesus Vega Estrada appeals from the judgment entered following a jury trial in which he was convicted of one count of second degree murder, in violation of Penal Code section 187, subdivision (a), and one count of assault on a child causing death, in violation of section 273ab, subdivision (a).[1]  He was sentenced to 25 years to life in state prison.

We conclude that the trial court prejudicially erred in omitting accomplice instructions, in light of substantial evidence that the child's mother might have been involved in the child's death.  We therefore reverse appellant's conviction and remand the matter for a new trial.

## FACTUAL BACKGROUND

Eric Cervantes (Eric), the child of appellant and Araceli Cervantes (Cervantes), died on November 28, 2013.  He was 19 months old.  Although initially ruled the result of natural causes, the death was later determined to be a homicide due to blunt force trauma.  Both parents came under suspicion, but ultimately only appellant was charged with Eric's murder.

### 1.  *Events Prior to Eric's Death*

Appellant and Cervantes became romantically involved in May 2012, and Cervantes became pregnant with Eric in August 2012.  Appellant tried to persuade Cervantes to have an abortion and offered to pay for it, but Cervantes refused.  Appellant then ceased contact with her for the duration of the pregnancy.

Eric was born on April 13, 2012.  Appellant called Cervantes while she was in the hospital and spoke with her for two to three minutes, asking about the child's weight, height, and condition.  He did not offer financial assistance to Cervantes for the baby, and Cervantes did not hear from appellant again until she filed paperwork to obtain child support when Eric was 10 months old.  After receiving the paperwork, appellant went to Cervantes's home and asked her to cancel her request for child support, promising to

---

[1] Undesignated statutory references are to the Penal Code.

2

move in and help her. Cervantes agreed, and on February 20, 2013, both she and appellant signed a cancellation of the request for child support, indicating that both parents and the child would be living together.

That day, appellant gave Cervantes $200 and assured her they would begin living together in about a month. But a month passed and appellant did not move in with her. In telephone conversations over the next three months, Cervantes repeatedly asked appellant whether they would move in together. Appellant told her he had a lot of expenses and she needed to be patient. Although appellant was supporting his four children from a previous marriage, he never gave Cervantes any more money to help with Eric. In October 2013, Cervantes received a letter "from child support" in the mail. When she raised the subject with appellant, he threatened to get an attorney and take Eric away from her if she reopened the case. Cervantes did not renew her request for child support.

After Eric was born, Cervantes lived with Victoria Ayala, who, along with her daughter, Nathali Perez, looked after the baby when Cervantes returned to work. In August 2013, Cervantes and Eric moved to a new apartment, and appellant began visiting once or twice a month. Ayala continued to take care of Eric while Cervantes was at work. Ayala noticed that after the move Eric became sad and withdrawn, and he cried more. Lorena Aguilar, Cervantes's friend of 16 or 17 years, also noticed a change in Eric's behavior. Whereas he had always been a tender, loving child, after the move he became nervous and frightened, and was standoffish with Aguilar. Nevertheless, Aguilar told the investigator after Eric's death that he had been a happy baby and was responsive to her. Aguilar never noticed bruises on Eric.

In October and November 2013, Eric had temper tantrums during which he would throw himself to the ground and hit his head on the floor. During one tantrum a week or two prior to his death, Eric hit the back of his head on the floor, and on November 27, 2013, he twice hit his forehead on the ground during another temper tantrum. Cervantes

3

did not observe any bruises on Eric as a result of these tantrums. Ayala never saw Eric have a tantrum or throw himself down and hit his head on the ground at her house.

In early October 2013, after appellant had spent the night with Cervantes, Cervantes heard Eric crying. When Cervantes asked appellant what was wrong with the child, appellant explained that as he was picking Eric up from his crib the baby hit his mouth with the baby bottle. Cervantes saw the inside of Eric's lower lip was bleeding and cleaned it. After that, according to Cervantes, Eric cried every time he heard appellant's voice.

Dr. Emil Dominguez was Eric's pediatrician at the Los Niños Medical Clinic from the time Eric was seven months old until his death. Dr. Dominguez was assisted by Stephen Gichuru, a licensed physician's assistant, who also examined and treated Eric on occasion. Eric suffered from asthma and presented with frequent wheezing and infections, which required treatment with a nebulizer and antibiotics. Eric did not gain weight well, which can be consistent with frequent illness, but he had no unusual medical conditions. When asked specifically, Dr. Dominguez noted that Eric's hemoglobin and platelet count were in the normal range, suggesting he did not have any type of blood coagulation disorder.

On November 14, 2013, Cervantes took Eric to the doctor for a cough and sore throat. Dr. Dominguez prescribed asthma medication as well as an antibiotic to be given once a day for 10 days. On November 26, 2013, Gichuru saw Eric for a routine physical exam. Gichuru noted that the child was underweight but appeared otherwise healthy. Gichuru conducted a complete head-to-toe examination and did not observe anything unusual. Eric did not have any bruising or other injuries to his body. He was not having any problems breathing. Gichuru checked Eric's stomach and reflexes and found nothing unusual. Had Gichuru noticed any injuries or abnormalities, he would have described them in his notes.

4

## 2. *Eric's Arm Is Broken*

On October 19, 2013, appellant spent the night with Cervantes and took Eric in his truck to get breakfast the next morning. He did not take the child safety seat. He returned 45 minutes later with doughnuts and coffee. When appellant returned, Cervantes found Eric lying on the floorboard of appellant's truck, and appellant wiping the baby's nose with a towel that had blood on it. At some point Eric began to cry.[2] Cervantes asked appellant what had happened, and he told her that Eric had almost fallen out of the truck when appellant opened the door, but he had managed to catch him. Cervantes did not notice anything wrong with Eric's arm at that time. Later that day, however, as she was changing Eric's clothes, Cervantes noticed bruises on Eric's back and on the left side of his head above his ear.

The next day, Monday, Eric was crying during his bath and Cervantes noticed his arm was swollen. She called appellant, but he did not answer his phone. Cervantes texted photos of Eric's apparent injuries to appellant and asked him what had happened. Appellant said that Eric had fallen and denied that he hit the child. On Tuesday Cervantes went to work and left Eric with Ayala. Ayala noticed bruising on Eric's left cheek, and when she changed him his arm seemed to be hurting. When Cervantes picked Eric up at 4:00 p.m. that day, Ayala told her that Eric's left arm was swollen and needed medical attention. Cervantes talked to appellant about taking Eric to the doctor, and appellant told her to wait two or three days so he could accompany her.

Cervantes did not wait, but took Eric to Dr. Dominguez on October 23, 2013. Concerned that a "social worker could come and they could take [her] child away," Cervantes told Dr. Dominguez that Eric had hurt his arm falling from a step. X-rays

---

[2] Cervantes initially testified that when she first saw Eric on the floor of the truck he was crying and appellant was wiping blood from his mouth or nose. But on cross-examination Cervantes explained that Eric did not begin to cry until she picked him up, and she did not see him bleeding, but only saw blood on the towel appellant was using to wipe his nose.

revealed a fracture near the elbow of Eric's left arm, along with soft tissue swelling and fluid in the elbow joint.[3] Eric was referred to the Orthopedic Institute for Children in Los Angeles for treatment, where he was seen by Dr. Tigren Avoian, an orthopedic physician, on October 25, 2013. The arm was placed in a cast, which was removed approximately four weeks later.

Dr. Avoian observed that the fracture was "fresh." Cervantes told Dr. Avoian that Eric had fallen on a step and landed on his elbow five days earlier. Although the type of fracture Eric suffered is very common in children,[4] Dr. Avoian noted an upward spiral component to the fracture, which is sometimes associated with child abuse. While "not highly suspicious," Dr. Avoian felt this made the case "a little bit different," meriting further investigation by a social worker to determine whether there was a lack of supervision or negligence. However, Dr. Avoian's full body examination of Eric did not reveal any other injuries or bruises, and he deemed Eric's physical development normal for his age.

Dr. Arnold Hageman, the radiologist at Orthopedic Institute for Children who reviewed Eric's X-rays, explained that the type of injury Eric had would have been very painful, and he would expect a child with this fracture to show immediate objective signs of pain. While each person has a different tolerance to pain, Dr. Hageman opined that it would be unlikely that a child with a fracture like Eric's could go for two days without exhibiting signs of pain. Dr. Avoian agreed that it would be very unlikely that a child with Eric's fracture would have no pain or swelling, but acknowledged that, especially with children, "you never know because [I've] seen somebody with minimal pain walking on the broken leg next day."

---

[3] Eric's broken arm was a simple oblique (angled) hairline fracture to the humerus—the bone that extends from the shoulder to the elbow.

[4] Indeed, according to Dr. Avoian, "When you land on your elbow, this is what usually happens."

After Cervantes learned that Eric had a broken arm, she called appellant and asked him how his arm had been broken.  Appellant responded that he would not hit his own child, but Cervantes did not believe him.  Sometime after Eric broke his arm, Cervantes told her friend Aguilar that "the dad had dropped the child when he went to buy doughnuts."

With his left arm in a cast, Cervantes noticed that Eric tended to fall more than usual.  And in early November when Eric still had the cast on his arm, Nathali Perez, Ayala's daughter, noticed three bruises on Eric's face on the same side as the cast.

### 3. *November 27–28, 2013*

On November 27, 2013, Cervantes changed and dressed Eric in the morning before taking him to Ayala's house.  Eric no longer had the cast on his arm, and he had no bruising on his body or injury to his testicles.  Ayala also did not see any bruises on Eric's body when she changed him that day.  Cervantes picked Eric up after work, put him in his car seat, and drove home.  Eric ate rice pudding in the car, and they reached their apartment about 4:10 p.m.  Once home, Eric played and Cervantes changed him twice.  She did not see any bruises on his body or head, nor did he have any injuries to his testicles.

Cervantes gave Eric a bottle of milk about 7:00 p.m. and put him to bed between 7:30 and 8:00 p.m.  She added Nestles strawberry Quik flavoring to the milk, which made it pink.  She took a picture of him in his crib at 8:53 that night.  No injuries to Eric's head were visible in the photo.

Cervantes called appellant at 9:50 p.m., but he did not answer.  Approximately 10:30 p.m., after Cervantes was in bed asleep, appellant called her back.  Appellant told

7

Cervantes he was on his way over, and they spoke until appellant said he was outside the apartment.[5]

While Cervantes was on the call with appellant, she got up and changed Eric's diaper. She also gave him more milk with strawberry flavoring, but he did not finish it. As Eric was falling asleep, appellant came in, and Eric began to cry when he heard appellant's voice. After Eric was calm, appellant took him in his arms, and the child put his head on appellant's shoulder and gave appellant his hand.

Appellant told Cervantes he wanted to take Eric to the store with him because it had been a long time since he had last seen him. Cervantes objected, saying it was too cold out, but appellant insisted. Appellant took a blanket and left with Eric. He did not ask Cervantes for the child safety seat from her car. Cervantes called appellant twice while he was gone—shortly after appellant had left, at 11:42 p.m., and again at 11:55 p.m., because he had been gone a long time and the store was only two minutes away. Appellant did not answer either call.

Appellant returned after 15 or 20 minutes and told Cervantes Eric was vomiting because she had given him too much milk. Cervantes saw Eric lying motionless on the bed. Appellant performed CPR, and Eric vomited but remained otherwise unresponsive. The vomit was pink, and it was on the baby's clothing, blanket, and Cervantes's bedspread. Photographs taken later showed a substance resembling pinkish vomit on the bed and a blanket in Cervantes's home, as well as in appellant's truck on the driver's seat, the middle seat, passenger seat, floorboard, glove compartment, and passenger door and window. Cervantes wanted to call 9-1-1, but appellant told her not to call because the child was responding.

---

[5] Cell phone records showed that Cervantes called appellant at 9:50 p.m., and appellant called Cervantes at 10:34 p.m. Appellant's call to Cervantes lasted 41 minutes, ending at 11:15 p.m.

Five to eight minutes after appellant had returned with Eric, Cervantes decided they should take Eric to the nearby hospital rather than wait for an ambulance. Appellant drove them in his truck. Cervantes sat in the front seat holding Eric in her arms. Appellant lowered the window to see if Eric would react, but he did not. Eric did not vomit on the way to the hospital, and Cervantes did not notice any bruises on his face. When they arrived at the hospital, appellant took Eric from Cervantes and handed him to the doctors.

Dr. David Gutkin, the attending emergency physician at Queen of the Valley Hospital, treated Eric when he was first brought into the emergency room. Eric arrived at the hospital at approximately 12:05 a.m. "in critical status in cardiac pulmonary arrest," meaning he had no heartbeat and was not breathing. Dr. Gutkin immediately placed a breathing tube to provide respiration; at the same time, chest compressions were begun, and epinephrine was given intravenously to try to jump-start the heart. At approximately 12:43 a.m., after prolonged resuscitation, Eric responded and some basic body functions—including a heartbeat—were restored. Eric remained on mechanical respiration and in critical condition as arrangements were made to transfer him to Miller Children's Hospital. While he was treating Eric, Dr. Gutkin did not observe any indication that Eric suffered from any blood coagulation disorder such as disseminated intravascular coagulation, or "D.I.C."

Dr. Gutkin's shift ended shortly after Eric's initial resuscitation, and Dr. Sam Thurber, who had participated in the resuscitation efforts when Eric was admitted, took over for Dr. Gutkin. At approximately 2:02 a.m., Eric lost spontaneous circulation. Resuscitation failed, and Eric was pronounced dead at 2:30 a.m.[6]

---

[6] At some point, Cervantes was asked to speak to her child to see if he would respond. She did so, and Eric cried when she caressed him. There was no other reaction, however, and Eric died.

9

Dr. Thurber initially reported the cause of Eric's death as natural causes, based on information that Eric had vomited while in his car seat and had likely inhaled the vomit into his lungs. When Dr. Thurber later examined Eric's body, however, he observed Eric "was covered with bruises"—there were multiple bruises around the top of his head, four bruise marks on the lower abdomen in a fingertip pattern, grip marks on either side of his body, and one of his testicles was three times the size of the other and was black from bruising.[7] A chest X-ray showed Eric had two or possibly three fractured ribs. After examining Eric's body and viewing the X-ray, Dr. Thurber revised his opinion about the cause of Eric's death, concluding that Eric died from blunt force trauma. He did not see any indication that Eric suffered from any blood coagulation disorder, such as D.I.C.

After Eric's death, Cervantes and appellant sat with him. Cervantes was in shock and crying. Appellant told her to tell the police that Eric had been in the child safety seat in his truck, but they had left it at the house when they came to the hospital. When Los Angeles County Deputy Sheriff Pedro Castillo tried to find out from Cervantes what had happened with Eric, appellant repeatedly interrupted Cervantes, spoke over her, and answered the questions posed to her. Appellant told the deputy that he had retrieved the car seat from Cervantes's car, mounted it in his truck, and had driven with Eric toward a nearby convenience store. About halfway to the store, however, the child had started vomiting what appellant believed to be milk. Although the baby was conscious, he did not appear to be breathing, and appellant made a U-turn to return to Cervantes's home. Appellant told Castillo that he took the child in the car seat into the house. Eric was not breathing and appeared to be unconscious, and appellant started CPR. But the child was not responding, and appellant decided to drive him to the hospital himself rather than wait for emergency services, which might take too long. Cervantes gave Castillo "pretty much

_____

[7] Dr. Thurber observed that none of the bruises looked "fresh," and both Drs. Gutkin and Thurber denied that these injuries would have been caused by the treatment Eric received at the hospital.

the same" account.[8]  Castillo noted that appellant seemed calm and relaxed, and Cervantes did not appear emotional or distraught.

Cervantes was shown photos of Eric that had been taken at the hospital, which showed injuries and bruising to his lips, right eye, the left side of his head, his chest, and his testicles.  Cervantes stated that Eric had not had any of these injuries before appellant took him in his truck that night, and she denied inflicting any injuries on her child.

Denise Bertone, an investigator for the Los Angeles County Coroner, conducted an external examination and took photographs of Eric's body.  Although Eric seemed to be in generally good health, she noticed a considerable amount of bruising, including bruises along his ribs the size of a quarter, and bruises on his right hip, forehead, left and right temporal areas, and the left side of his chest.  Eric's left testicle was bruised and swollen.  Bertone asked the parents if Eric had any underlying medical problems such as blood-clotting issues that might explain the bruising.  Cervantes said that Eric did not have "hemophilia or anything like that."  While bumps or bruises on the forehead and lower legs are considered normal for an active child, the other bruises and injuries Eric had are not.  Bertone also observed that Eric was unusually pale even after death, causing her to wonder if he had been bleeding internally and where his blood had gone.  Bertone spoke with Dr. Thurber and viewed the X-ray of Eric's chest, which showed what appeared to be broken ribs.  Based on her observations, Bertone decided to process Eric's death as a homicide.

After further interviews with police detectives, Cervantes and appellant went to the sheriff's station, where they were told they would both be arrested for murder.  Following several more interviews, Cervantes and appellant were arrested at approximately 11:30 a.m. on the day Eric died.

---

[8] Cervantes admitted lying to the deputy about appellant taking Eric in the car seat. She explained that she was upset and lied because she did not know what was going on. When Castillo spoke to Cervantes a second time, however, she told him that appellant did not take the car seat.

#### 4. *Prosecution Expert Testimony*

Dr. James Ribe, a forensic pathologist and the senior deputy medical examiner for the County of Los Angeles Coroner's Office, conducted Eric's autopsy. Eric's external injuries included bruises to his right upper and lower eyelid, a bruise to his right cheek, a thin cut inside his left ear, and some blood in the left ear canal. He also had several bruises on his lower forehead, left temple and left cheek, and an abrasion to the right lower lip, which was slightly swollen, indicating Eric was alive when he received the "blow to that part of the mouth." In Dr. Ribe's opinion, these bruises indicated multiple blunt force blows, most likely from an adult's hand or fist. A large bruise extending over a wide area of the top of Eric's head indicated multiple blunt force impacts to the top of the head. Dr. Ribe opined this injury was the result of recent blows to the head or the head striking some kind of hard flat surface.

Dr. Ribe observed a large number of bruises on both the left and right sides of Eric's torso, beginning below the armpit and extending almost down to his hip, as well as a large bruise or cluster of bruises in the right lower abdomen flank area. The injuries to Eric's left chest, flank, and upper and middle abdomen and toward the back were "indicative of blows to the chest and abdomen by an assailant who struck multiple blows to the child's torso."

Dr. Ribe observed multiple bruises to the right chest wall and right flank, including a large—approximately two-and-a-half-inch—cluster of bruises on the right lower abdomen. Dr. Ribe noted the multiple bruises were scattered and widely dispersed; their distribution suggested to Dr. Ribe that they had resulted from multiple separate impacts and were characteristic of bruises from blows by a human hand or fist. The examination also revealed a large area of bleeding and swelling to the left side of the scrotum.

During the autopsy dissection Dr. Ribe found three broken ribs on the left rib cage, which had caused a large amount of chest wall bleeding while Eric was alive. Dr. Ribe also found a large amount of free blood in the peritoneal cavity, which is the inside of the abdomen. This indicated that Eric had suffered internal injuries which caused him to

12

bleed heavily inside his abdomen. The blows to both sides of Eric's abdomen, as indicated by the areas of bruising, were sufficient to account for the internal abdominal injuries.

Dr. Ribe collected approximately 200 cubic centimeters of blood from the peritoneal cavity. This blood had not clotted, suggesting "a slower bleed rather than an extremely fast bleed." Eric's liver had two large subcapsular hematomas or contusions, caused by blunt force injury to the right flank. The liver was also pale, which meant it had suffered blood loss, and it had two large lacerations to the underside, which Dr. Ribe opined accounted for the blood in the peritoneal cavity. According to Dr. Ribe, these lacerations to the liver would have required a very powerful blow from the side or at an upward angle to penetrate the abdominal wall, causing the capsule on the underside of the liver to tear.

The mid-portion of Eric's small intestine was gray-purple and extremely dilated, indicating ischemia—that is, it had completely lost its blood supply and had died,[9] probably a few hours before the child's death. Dr. Ribe explained that during the process of dying from internal bleeding, the body goes into shock and the nervous system diverts the blood supply to the chest and head and away from the intestines, which are not required for immediate survival. At this point, the ischemia process begins.

Dr. Ribe also found a large dark red hematoma in the left inguinal canal and around the left testicle. He attributed this injury to a blow to the left scrotum, which caused severe bleeding into the tissues around and within the left testicle. Although it is possible for blood from an abdominal injury to drain down into the scrotum, Dr. Ribe explained that did not occur here because such drainage occurs on both sides, and the blood would drain on the outside of the tissues around the testicle and spermatic cord. In Eric's case, however, only the left testicle was affected while the right testicle was

---

[9] According to another expert, "ischemia is just simply lack of blood supply to an organ."

13

normal, and the hematoma was contained within the membrane around the left testicle and the spermatic cord.

Dr. Ribe opined that the cause of Eric's death was blunt force trauma inflicted by an adult. He explained that the multiple injuries Eric had suffered were consistent with a person much larger and stronger than Eric slamming him against something. Eric's injuries also involved multiple blows to his face and on both sides of his body, against which he was helpless to defend himself. In particular, the injuries inside the abdomen indicated a large degree of force consistent with fatal internal bleeding and sufficient to break bones. While all of the injuries contributed to Eric's death, in Dr. Ribe's opinion, it was the lacerations to the liver that killed him.

Dr. Ribe was unable "to determine with scientific certainty exactly when the injury occurred," but opined that Eric had sustained his injuries "probably a few hours before" he was admitted to the emergency room. The shortest amount of time possible between infliction of the fatal injury and death was "probably about two hours." In his opinion, Eric was "effectively dead" when he arrived in the emergency room at 12:10 a.m. because he never recovered a "significant heartbeat" the whole time. Dr. Ribe did not believe that resuscitation efforts, including pressing on his stomach or abdominal area, would have increased the rate of bleeding from the liver lacerations, but he could not say what effect the resuscitation process would have on the two-hour time frame he had given. He also could not say whether it was possible that the injuries Eric sustained could have occurred within 30 to 45 minutes before his arrival at the hospital.

Dr. Aaron Miller, a board certified physician in general pediatrics and child abuse pediatrics, reviewed Eric's birth and medical records, including those from his pediatrician for well child care and sick visits, and the X-rays and records related to the broken arm. He also reviewed the hospital records from Eric's admission on November 28, the medical examiner's reports, the photographs from the hospital and the autopsy, the X-rays from the autopsy, and the reports from the defense experts. Based on his review of all of these records, it was Dr. Miller's opinion that Eric died as a result of

14

child abuse. Dr. Miller explained that his opinion was "based upon the number of injuries, the severity of injuries, and the location of the injuries, and the lack of any other medical causes that could reasonably explain these findings."

Dr. Miller found no clear signs of any health problems from the records of Eric's well child check-up on November 26, 2013. But the broken arm in October did raise cause for concern. The three-day period between the injury and seeking medical treatment indicated neglect, and the nature of the fracture suggested possible abuse. While the specific fracture Eric had could have resulted from a fall from a step, Dr. Miller opined that this was not very likely because the curve of the fracture was indicative of "some sort of twisting component when the force was applied to cause the facture," which would be inconsistent with the child falling from a six-inch step.

Dr. Miller also found the marks on Eric's stomach and his split upper lip to be suspicious types of injuries on a child. Specifically, Dr. Miller opined that the marks on Eric's abdomen appeared to have been "inflicted by some sort of slapping of the hands or knuckle or something else with a similar shape." These marks did not look like an infectious or allergic rash; they looked like finger marks. And according to Dr. Miller, "you don't get rashes that do these weird shapes that look like the outline of fingers."

Dr. Miller expressed concern over the unusually high number of different injuries documented in the autopsy, citing the three broken ribs, "bruises all over the head on two different sides," multiple other bruises and bleeding under the connective tissue layers under the scalp, lacerations to the liver, which caused severe bleeding into the abdomen, and the necrosis from lack of oxygen from injury to the connective tissue fat around the abdomen and parts of the intestines. Based on his training, experience, and background, Dr. Miller opined that CPR would not have caused the broken ribs, "[e]ven poorly done CPR." Given the child's small size, the rib fractures could have been the result of one severe blow. Dr. Miller also explained that Eric's eyelids and upper gums had petechial hemorrhages—"little bursted blood vessels"—which might suggest direct trauma or possible strangulation. Dr. Miller was also concerned by the injuries to Eric's forehead

15

and on both sides of his head, which were consistent with multiple blunt force blows, not from a child's fall. In Dr. Miller's opinion, there were "too many different bruises in different planes [of the head] to be accidental."

Dr. Miller opined that the lacerations to the liver, which resulted in serious bleeding into the abdomen, were caused by severe blunt trauma inflicted sometime within a "few hours" of Eric's death. "But I can't tell you if it happens a half hour ago or two hours ago." Dr. Miller explained that he could not be more precise about the time of injury because "you're dealing with multiple different blood vessels of different sizes and thickness and being able to be compressed and, with the heart beating a hundred times a minute, that's a hundred gushes a minute of more blood coming out." While "it would be pure conjecture" to say how long it took for the blood, which was about a quarter of Eric's total blood volume, to fill his abdomen, Dr. Miller stated that the blood loss from the liver lacerations would have caused Eric to be faint and then lose consciousness. Dr. Miller added that a child who is injured so severely as to result in death would be "symptomatic within minutes."

Dr. Miller reviewed the defense expert's report and disagreed with its conclusion that the cause of Eric's death was a blood clot in the superior mesenteric artery (the artery that supplies the blood to all of the small intestine), which deprived the intestine of oxygen and caused ischemia. Dr. Miller noted that there was no finding of a superior mesenteric artery thrombus (a blood clot that forms in the artery, as opposed to a clot that forms elsewhere and travels through the bloodstream) in the autopsy report, and none of Eric's medical records suggested any bleeding disorder or coagulopathy. Moreover, even if Eric had such an undiagnosed condition, in Dr. Miller's opinion, it was not the cause of Eric's death, nor did it explain the severe trauma to the liver, the broken ribs, or the broken arm.

Dr. Miller explained that D.I.C. is an "end stage process right before death," commonly caused by sepsis (a severe bacterial infection that completely overwhelms the immune system) or brain trauma. D.I.C. does not cause lacerations to the liver or broken

16

bones.  One of the symptoms of D.I.C. is bleeding from the mucus membranes of the eyes and nose, and blood in the stool and urine.  Eric did not present with any of these symptoms,[10] nor was there any evidence of sepsis or brain trauma.

### 5. *The Defense*

Dr. Marvin Pietruszka is a board certified pathologist, toxicologist, clinician, and professor with over 40 years' experience.  Based on his review of extensive literature, the medical records, coroner's report, pathology slides from the autopsy, X-rays, and photographs of the child, Dr. Pietruszka concluded that Eric's death was caused by disease, not inflicted trauma.  Specifically, in Dr. Pietruszka's opinion, the cause of death was ischemic bowel.  Dr. Pietruszka opined that a mild trauma to the head or abdomen triggered a fatal coagulation process (D.I.C.) that produced a blood clot, which cut off circulation to a portion of the bowel, resulting in necrosis of intestinal tissue or ischemic bowel, and, ultimately, death.

Dr. Pietruszka described D.I.C. as a complicated and life-threatening disease of the body's blood coagulation system in which the body has an abnormal production and breakdown of blood clots.  He explained:  "Normally, if we cut ourselves, we form a blood clot and the wound heals.  In [D.I.C.], the process continues on and on with a risk of death of over 57 %."  D.I.C. is usually a secondary condition resulting from some other event, such as trauma, infection, sepsis, cancer, or an abdominal problem.  It can even result from a mild trauma such as hitting the head or falling on the abdomen.

In Dr. Pietruszka's opinion, the coagulation process could have been triggered by the child hitting his head or abdomen during a temper tantrum, movement in a car seat, or twisting of the bowel.  Over many hours after the initial trauma, a clot or blockage would have occurred in one of the branches of the superior mesentery artery or the superior mesenteric vein, blocking circulation and causing necrosis of the intestinal tissue.  The

---

[10] The left ear showed some crusting of blood, but Dr. Miller attributed this to the slight cut above the ear, indicating trauma rather than a symptom of D.I.C.

fact that only one section of the intestine was affected indicated that the necrosis was caused by blockage of a blood vessel and not a loss of circulation due to shock. Had the loss of blood supply been due to shock, the entire intestine would have been black and it would not have had normal-appearing and slightly hemorrhagic portions as Eric's did. The coagulation process would also produce hematomas in other areas of the body, including the face, chest, hips, thighs, and extremities, which would appear as bruises. Dr. Pietruszka did not believe that all of Eric's hematomas were necessarily related to D.I.C., and conceded that a bruise to Eric's eye could be related to falling.

Dr. Pietruszka further opined that the lacerations to the liver and the lateral rib fractures resulted not from inflicted trauma, but from the aggressive resuscitation efforts undertaken at the hospital. He explained that CPR puts pressure on the sides of the ribs, sometimes causing them to fracture, but fractures from inflicted trauma generally occur to the back of the ribs. Similarly, the only traumatic injury to the abdomen occurred during resuscitation. Finally, Dr. Pietruszka stated that blood draining from the inguinal canal into the scrotum accounted for the hematoma on the child's left testicle.[11] If an injury had been inflicted, both testicles would have been involved, not just the tissue around one of them.

According to Dr. Pietruszka, the necrotic intestinal tissue caused death in six to eight hours, not ten minutes or one to two hours. Based on the time of death pronounced by Dr. Thurber, 2:30 a.m., the vascular event that resulted in the child's death must have occurred between 6:30 and 8:30 p.m. the night before.

Dr. John Lipham, a surgeon and division chief of general surgery at the Keck Medical Center at the University of Southern California, reviewed Eric's medical records, the autopsy report, photos, and the preliminary hearing transcript in this case. In his opinion, the cause of Eric's death was the ischemic bowel. Dr. Lipham opined that Eric

[11] Dr. Gutkin agreed on cross-examination that the hematoma on the left scrotum could have resulted from abdominal bleeding tracking down into the testicle.

18

was dead when he arrived at the emergency room without a pulse, and the condition that caused the ischemia could not have occurred less than an hour before death. In Dr. Lipham's experience, it would take five to six hours from the time the blood supply was cut off to that section of the bowel for it to become as black as Eric's bowel.

Dr. Lipham noted that if blood loss were responsible for the ischemic bowel, the entire bowel would have become ischemic, but in this case, other areas of the intestine had not been compromised. Dr. Lipham explained that a segmental ischemia, where just a portion of bowel has died from lack of blood supply, has several possible causes: One is when a blood clot cuts off the blood supply. Such clots are of two kinds: A thrombotic event, wherein a blood clot forms in the blood vessel; and an embolic event, in which a blood clot forms elsewhere in the body, travels through the bloodstream, and lodges in a narrow portion of the blood vessel. A condition seen especially in children, in which the intestines rotate or twist on their main blood vessel, can also cause a segment of the bowel to become ischemic. Finally, D.I.C., where coagulation of the blood "gets all out of kilter," can lead to segmental ischemia. Head trauma, infection, sepsis, and other trauma can lead to D.I.C., and the condition can bring about blood clots, bleeding, or both at the same time.

The two lacerations to Eric's liver were fairly small and not very deep, leading Dr. Lipham to conclude that they "probably would have bled fairly slowly, more of an ooze." In his opinion, it would have taken hours for these lacerations to bleed enough to become clinically significant, and they were not the cause of death. In Dr. Lipham's experience performing emergency surgeries over the years, liver lacerations from CPR are fairly commonplace occurrences. So too are rib fractures. In fact, Dr. Lipham explained that "it's not too terribly difficult to break a rib or two" during CPR, and he confessed he had done it himself. Dr. Lipham had also seen fractured ribs and liver lacerations from CPR in small children like Eric.

19

## DISCUSSION

### The Trial Court's Omission of Accomplice Instructions

### Constituted Prejudicial Error

Appellant contends that, assuming Eric's death resulted from abuse, there was substantial evidence the fatal blow was inflicted on Eric at or before 10:00 p.m. on November 27, 2013, during which time it was undisputed that Cervantes had sole care of the child. Appellant further points out that Cervantes was initially suspected in the child's killing and was arrested along with appellant. Accordingly, there being substantial evidence from which the jury could conclude that Cervantes was responsible for the child's death, appellant asserts that the trial court erred in accepting appellant's agreement that the jury not be instructed pursuant to CALCRIM No. 334. ("Accomplice Testimony Must Be Corroborated: Dispute Whether Witness Is Accomplice.") Appellant contends that the error was prejudicial under any standard, and his conviction should therefore be reversed.

#### A. *Relevant Background*

According to Dr. Ribe, Eric was "effectively dead" by 12:10 a.m. when he arrived at the emergency room. In his opinion, the lacerations to the liver were fatal, and resulted in death "a few hours" after the injury was inflicted. Dr. Ribe opined that the shortest interval between the trauma causing lacerations to the liver and Eric's death was two hours, meaning infliction of the fatal injury could not have occurred later than 10:00 p.m.[12] Both experts opined that it would take five to six hours from the time the blood supply was cut off to a section of the bowel for it to become as black as Eric's was, thus placing the vascular event that resulted in the partial ischemic bowel between 6:30 and

---

[12] Dr. Miller, who concurred in Dr. Ribe's conclusion about the cause of death, could only say that the blunt trauma that caused the liver lacerations was inflicted sometime within "a few hours" of Eric's death. But Dr. Miller stated that "it would be pure conjecture" to say how long it took for the blood loss to result in death, and it was impossible to pinpoint the time of injury with any precision.

20

8:30 p.m. the night before. The evidence was undisputed that Cervantes had sole care of the child until appellant arrived at the apartment at 11:15 p.m., and she was arrested with appellant in connection with the child's death. Nevertheless, Cervantes was ultimately released and was never charged with any crime. She testified at length at trial.

The trial court's packet of instructions included CALCRIM No. 334, which required corroboration of Cervantes's testimony implicating appellant with the crime if the jury found her to be an accomplice. The court observed it had a sua sponte duty to give the instruction. However, apparently during an off-the-record discussion, both defense counsel and the prosecutor asked that the instruction not be given, and confirmed that request on the record. In response, the court stated: "And it's understood that the objection to [the accomplice instruction] eliminates the necessity of corroboration of Ms. Cervantes's statement and testimony if the jury were to determine that she was an aider and abettor. With that understanding, does the defense still request that that instruction not be given?" Defense counsel responded affirmatively, and appellant joined the request.

## B. *Accomplice Instructions Were Required in Light of Substantial Evidence that the Child's Mother Was Involved in his Death*

As a preliminary matter, respondent contends that the doctrine of invited error bars appellant from raising this claim. We disagree. " 'When a defense attorney makes a "conscious, deliberate tactical choice" to [request or] forego a particular instruction, the invited error doctrine bars an argument on appeal that the instruction was [given or] omitted in error.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 675; *People v. Russell* (2010) 50 Cal.4th 1228, 1250 ["the doctrine of invited error applies when a defendant, for tactical reasons, makes a request acceded to by the trial court and claims on appeal that the court erred in granting the request"].) " '[T]he doctrine . . . is " 'an "application of the estoppel principle" . . . . [Citation.] . . . At bottom, the doctrine [aims] . . . to prevent a party from misleading the trial court and then profiting therefrom in the appellate

21

court.' " ' " (*People v. Mason* (2013) 218 Cal.App.4th 818, 823, quoting *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.)

The invited error doctrine does not preclude review of a party's claim in all instances where the party seeks to challenge an instructional omission that his action or inaction helped to bring about. A claim is barred under the doctrine "if trial counsel both ' "intentionally caused the trial court to err" ' and clearly did so for tactical reasons. [Citation.] Invited error will be found, however, only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction." (*People v. Souza* (2012) 54 Cal.4th 90, 114.) The invited error concept is thus limited to the narrow circumstance in which "the record indicated a 'deliberate' or 'expressed' *tactical* decision by counsel to forego a particular instruction which the court was otherwise obliged to render to the jury." (*People v. Graham* (1969) 71 Cal.2d 303, 318; *People v. De Leon* (1992) 10 Cal.App.4th 815, 823–824.)

Respondent argues that a tactical decision to omit the accomplice instructions may be inferred because appellant's "main defense" was that Eric died not as a result of homicide, but from an undiagnosed blood disorder, and accomplice instructions would have conflicted with that defense. To the contrary, no tactic or strategic reason appears in the record to explain the decision to forgo such instruction, particularly since a critical part of appellant's defense was that whatever the cause of Eric's death, the event triggering it occurred hours before the undisputed evidence placed him alone with the child. As we discuss below, based on the evidence presented at trial, the court had a sua sponte duty to give the accomplice instruction, and given the absence of an express tactical purpose for forgoing the instruction on the record, we conclude the invited error doctrine does not bar our consideration of the claim in this case.[13] (See *People v. Najera* (2008) 43 Cal.4th 1132, 1136–1137; *People v. Mason*, *supra*, 218 Cal.App.4th at p. 824.)

_____

[13] In any event, a claim may be reviewed despite an invited error where the instructional error affected the defendant's substantial rights so as to effect a miscarriage

22

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' " (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189; *People v. Najera*, *supra*, 43 Cal.4th at p. 1136.) "Section 1111 does not affect the admissibility of accomplice testimony but rather 'reflects a legislative determination of how accomplice testimony must be treated.' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32 (*Romero and Self*).) Our Supreme Court has recognized that the accomplice corroboration requirement constitutes a general principle of law vital to the jury's consideration of the evidence, and the trial court's sua sponte instructional duty extends to instruction on this principle. (*People v. Najera*, *supra*, 43 Cal.4th at p. 1137; *People v. Warren* (1940) 16 Cal.2d 103, 117.) Accordingly, " '[w]hen there is sufficient evidence that a witness is an accomplice, the trial court is required on its own motion to instruct the jury on the principles governing the law of accomplices,' including the need for corroboration." (*People v. Tobias* (2001) 25 Cal.4th 327, 331.)

We review appellant's claim of instructional error de novo, and conclude that the trial court erred in omitting the accomplice instruction in this case. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Cole* (2004) 33 Cal.4th 1158, 1210.)

An accomplice is subject to prosecution for the identical offense charged against the defendant by reason of being a direct perpetrator, aider and abettor, or coconspirator. (§ 1111; *People v. Houston* (2012) 54 Cal.4th 1186, 1224.) The definition encompasses all principals to the crime, but does not include accessories. (*People v. Valdez* (2012)

---

of justice (§ 1259; *People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249), or where, in choosing to forgo a particular instruction, counsel rendered ineffective assistance. (See *People v. Cooper* (1991) 53 Cal.3d 771, 831 [if counsel acted incompetently in making deliberate choice for express tactical reason in requesting instruction not be given, defendant may claim he received ineffective assistance of counsel].)

55 Cal.4th 82, 145; *People v. Boyer* (2006) 38 Cal.4th 412, 467.)  Whether a witness is an accomplice is a question of fact for the jury.  (*People v. Hayes* (1999) 21 Cal.4th 1211, 1271.)  " 'When the evidence at trial would warrant the jury in concluding that a witness was an accomplice of the defendant in the crime or crimes for which the defendant is on trial, the trial court must instruct the jury to determine if the witness was an accomplice.' "  (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 214.)  The jury must further be instructed that if it finds by a preponderance of the evidence that the witness was an accomplice, the witness's testimony should be viewed with distrust, and no conviction may be had on the basis of the uncorroborated testimony of the accomplice.  (*People v. Hinton* (2006) 37 Cal.4th 839, 879.)

There was abundant evidence in this case from which the jury might have concluded that Cervantes could have been subject to prosecution as a direct perpetrator, aider and abettor, or coconspirator in the identical offense for which appellant was charged.  Dr. Ribe, the coroner who performed the autopsy, opined that the fatal injury was inflicted two hours or more before death—at or before 10:00 p.m.—during which time it was undisputed that Cervantes was alone with Eric.  Cervantes had sole care of the child until 11:15 p.m.  And between 11:15 p.m. and 12:10 a.m., Cervantes and appellant then had joint care of the child, except for a 15- to 20-minute period when appellant had the child alone with him in his truck.  Indeed, Cervantes was arrested along with appellant as a suspect in the child's murder.  The evidence also established that Cervantes and appellant were together when Eric received injuries possibly indicating child abuse or neglect in October 2013—when Eric hit his mouth on a baby bottle, causing his lip to bleed, and the day Eric broke his arm.  Cervantes claimed she had lied when she had told the pediatrician, her friends, and the police that the child had broken his arm in a fall from a step at home.  According to Cervantes, Eric broke his arm when appellant dropped him

24

on October 20, but she did not immediately notice anything was wrong, and did not seek medical attention for him until three days later.[14]

Given her intimate involvement in all of the events leading up to Eric's death and her arrest for the murder, Cervantes had an "obvious interest in avoiding or minimizing prosecution for the charged offense." (*People v. Guiuan* (1998) 18 Cal.4th 558, 575, (conc. opn. of Kennard, J.).) Accordingly, this evidence was more than sufficient to warrant submission of the question of whether Cervantes was an accomplice to the jury, and if the jury so found, to require corroboration of Cervantes's testimony. The trial court erred in failing to so instruct the jury.[15]

### C. *The Error Was Not Harmless*

"Instructional error is subject to harmless error review. [Citation.] Because the omitted instruction is based on section 1111, the asserted error is one of state law, subject to the reasonable probability standard of harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836–837." (*People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 214.)

The corroboration requirement of section 1111 is based on the Legislature's determination that " ' "because of the reliability questions posed by" ' accomplice testimony, such testimony ' "by itself is insufficient as a matter of law to support a conviction." ' " (*Romero and Self*, *supra*, 62 Cal.4th at p. 32.) "Thus, for the jury to rely

---

[14] Expert testimony that a broken arm such as Eric's would have caused considerable pain and the child would likely have been very vocal about it cast doubt on Cervantes's claim that the incident causing Eric's broken arm occurred on October 20.

[15] Respondent also contends that if Cervantes committed any crime, it was as an accessory after the fact, not as an accomplice. The contention lacks merit. As defined by statute, an accessory includes "[e]very person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof." (§ 32.) Here, while the evidence supports the conclusion that Cervantes was a principal or aider and abettor, nothing in the record suggests that she assisted appellant only after Eric's death with knowledge that he was responsible for killing the child.

on an accomplice's testimony about the circumstances of an offense, it must find evidence that ' "without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime." ' [Citations.] 'The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration.' [Citations.] The evidence 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation], and ' "may be circumstantial or slight and entitled to little consideration when standing alone." ' " (*Id*. at pp. 32–33; *People v. Hinton*, *supra*, 37 Cal.4th at p. 880.)

The failure to instruct on accomplice liability under section 1111 is harmless if the record contains sufficient corroborating evidence which " 'tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 370; *People v. Hinton*, *supra*, 37 Cal.4th at p. 880.) However, " ' "corroborating evidence must do more than raise a conjecture or suspicion of guilt." ' " (*People v. Szeto* (1981) 29 Cal.3d 20, 27.) Our Supreme Court has held that "section 1111 provides that an accomplice's testimony is not corroborated by evidence that 'merely shows the commission of the offense or the circumstances thereof.' In other words, an accomplice's testimony is not corroborated by the circumstance that the testimony is consistent with the victim's description of the crime or physical evidence from the crime scene. Such consistency and knowledge of the details of the crime simply proves the accomplice was at the crime scene, something the accomplice by definition *admits*. Rather, under section 1111, the corroboration must connect the defendant to the crime *independent* of the accomplice's testimony." (*Romero and Self*, *supra*, 62 Cal.4th at p. 36.) After examining the long history of section 1111, the high court concluded, "Our cases continue to refer to the requirement that the corroborating evidence ' "must, without aid from the accomplice's testimony, tend to connect the defendant with the crime." ' " (*Id*. at p. 37.)

26

Thus, "[t]o determine if sufficient corroboration exists, we must eliminate the accomplice's testimony from the case, and examine the evidence of other witnesses to determine if there is any inculpatory evidence tending to connect the defendant with the offense." (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543; *People v. Shaw* (1941) 17 Cal.2d 778, 803–804.) Here, all of the evidence implicating appellant with the killing of this child came from the uncorroborated testimony of Cervantes, who was alone with Eric during the critical time when the prosecution's own experts believed the fatal injury was inflicted. Moreover, not only did Cervantes have reason to lie about her involvement with the child's death, but she demonstrated a willingness to prevaricate on multiple occasions throughout the investigation and trial of this case.

In these circumstances, we are particularly mindful of Justice Kennard's admonition in *People v. Guiuan*: "[S]pecial caution is warranted because an accomplice's firsthand knowledge of the details of the criminal conduct allows for the construction of plausible falsehoods not easily disproved. This court has previously described the problem in these words: '[A]ccomplice testimony is frequently cloaked with a plausibility which may interfere with the jury's ability to evaluate its credibility. " '[A]n accomplice is not merely a witness with a possible motive to tell lies about an innocent accused but is such a witness peculiarly equipped, by reason of his inside knowledge of the crime, to convince the unwary that his lies are the truth.' " ' " (*People v. Guiuan*, *supra*, 18 Cal.4th at p. 575 (conc. opn. of Kennard, J.), quoting *People v. Tewksbury* (1976) 15 Cal.3d 953, 967.)

Had the jury been afforded the opportunity to determine whether Cervantes was an accomplice and weigh her testimony accordingly, we conclude it is reasonably likely appellant would have obtained a more favorable result in this case. (*People v. Watson*,

*supra*, 46 Cal.2d at pp. 836–837.)  The trial court's instructional omission therefore cannot be deemed harmless.[16]

**DISPOSITION**

The judgment is reversed and the matter is remanded for a new trial.

NOT TO BE PUBLISHED.


LUI, J.

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

[16] Our conclusion that the trial court's failure to give the accomplice instruction constituted prejudicial error is not to be construed as holding that Cervantes was an accomplice as a matter of law.  To the contrary, we emphasize that any such determination is a question of fact for the jury, which should be instructed that if it finds by a preponderance of the evidence that the witness was an accomplice, the witness's testimony should be viewed with distrust, and no conviction may be had on the basis of the uncorroborated testimony of the accomplice.  (*People v. Hayes*, *supra*, 21 Cal.4th at p. 1271; *People v. Hinton*, *supra*, 37 Cal.4th at p. 879.)

28